No. 104,392

STATE OF KANSAS, *Appellee*, v. JONELL LLOYD, *Appellant*.

(325 P.3d 1125)

Opinion filed May 30, 2014.

*Debra J. Wilson*, Capital and Conflicts Appellate Defender, argued the cause and was on the briefs for appellant.

*Lesley A. Isherwood*, assistant district attorney, argued the cause, and *Nola Tedesco Foulston*, district attorney, and *Derek Schmidt*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

BILES, J.: A jury convicted Jonell Lloyd of first-degree premeditated murder, felony murder, and abuse of a 17-month-old child. He appeals his convictions, arguing: (1) reversible error in denying his belated motion to strike a prosecution witness' pretrial statement and trial testimony; (2) insufficient evidence to support premeditated first-degree murder; and (3) reversible error in admitting evidence of another crime contrary to K.S.A. 2009 Supp. 60-455. We affirm his convictions.

Lloyd also challenges his life sentence, claiming the district court erred by imposing a life sentence without possibility of parole for 50 years (hard 50). He contends the hard 50 sentencing procedure set out in K.S.A. 21-4635 is unconstitutional in light of *Alleyne v. United States*, 570 U.S. \_\_\_\_, 133 S. Ct. 2151, 186 L. Ed. 2d 314

(2013). We agree. See *State v. Soto*, 299 Kan. 102, Syl. ¶ 9, 322 P.3d 334 (2014) (concluding hard 50 sentencing scheme that permits a judge—rather than a jury—to find aggravating circumstances necessary to impose an increased mandatory minimum sentence violates the Sixth Amendment to the United States Constitution under *Alleyne*).

In Lloyd's case, after conducting an evidentiary hearing on the matter, the trial judge found by a preponderance of evidence two statutory aggravating circumstances to justify increasing Lloyd's mandatory minimum sentence: (1) existence of a prior felony conviction in which the defendant inflicted great bodily harm or .disfigurement (K.S.A. 21-4636[a]); and (2) defendant committed the crime of conviction in an especially heinous, atrocious, or cruel manner (K.S.A. 21-4636[f]). The judge also found the mitigating evidence offered by Lloyd did not outweigh those aggravating circumstances.

Accordingly, we must vacate Lloyd's hard 50 life sentence based on *Alleyne* and *Soto* and remand for resentencing.

## FACTUAL AND PROCEDURAL BACKGROUND

Chavira Brown was 17 months old when she was found dead in the attic of Lloyd's house. She was born to Jessica Jackson, who believed Lloyd was the child's father, so he occasionally watched Chavira. Lloyd lived with his girlfriend, Tameika Loudermilk, and their 8-month-old son.

As Jackson testified at trial, Lloyd left her a voicemail message on July 31, 2008, saying he had lost Chavira at a city park. Jackson and her sister went to Lloyd's house, where he explained he had taken Chavira and his son to the park but lost her while changing the boy's diaper. Lloyd would later admit he fabricated this explanation. He later testified he lost Chavira at his house but did not want to say so because he sold drugs there. Jackson testified Lloyd asked the two women not to call the police because he had outstanding arrest warrants. Jackson's sister, however, reported the child missing, and then the two women went to the park to look for Chavira. Lloyd admits he left the house.

When Jackson arrived at the park about 8 p.m., police officers were already there. After speaking with her, an officer drove Jackson to Lloyd's house, where the officer talked with Loudermilk, who initially denied knowing Lloyd. But after another person told officers Lloyd lived there, Loudermilk admitted Lloyd had been at the house, but she did not know his whereabouts and had not seen Chavira recently. Police arrested Loudermilk for obstruction and took her into custody, which led to a series of interviews at the police station that began after midnight. Loudermilk's statements to investigators and her trial testimony were central to the investigation and prosecution and play prominently in the conviction-related issues on appeal.

Detective Brian Hightower first interviewed Loudermilk. She initially repeated that she did not know Chavira's whereabouts, but she did describe how Lloyd had shouted at Chavira because she wet herself. At 2:53 a.m., Officer Michael John Nagy took over the interview and admits he was "pretty rough" in his questioning in order to get Loudermilk to tell where Chavira was. Nagy was aware Loudermilk's infant son was in protective custody after her arrest, so he told Loudermilk he would help get her son back from protective custody if she cooperated. He also told her she would "be in a world of hurt" if she did not help locate Chavira. But Loudermilk offered no additional information. Nagy then changed tactics.

Nagy told Loudermilk she would go to jail for a long time if something bad happened to Chavira; and, if that happened, her son would go into "the system" and she would be unable to see him. Toward the end of this interview, Nagy told Loudermilk he was going to get the truth from another witness who had talked to Lloyd and knew what happened. Nagy told her to think about whether charging her with murder was fair to her and her son. He then left the room and Detective Lennie Rose entered. At around 4:45 a.m., Loudermilk made statements incriminating Lloyd—most critically, she said she thought Chavira was in the attic of the house.

Officers secured a search warrant and discovered in the attic what they initially described as a black bag, which was actually a

sofa cushion cover filled with three black plastic trash bags, one bag inside the other, and "knotted, tied." The innermost bag contained Chavira's body.

The State charged Lloyd alternatively with first-degree premeditated murder and felony murder with the underlying felony of child abuse. It also charged him with child abuse.

At trial, Loudermilk testified as a State witness. She said she was at home the day Chavira died and mainly stayed in her bedroom. She said she saw Lloyd in the living room hitting Chavira with a belt for about 20 minutes because the child had wet herself. Loudermilk did nothing to stop him. She said she walked through the living room later and saw Lloyd with his hand around the backside of Chavira's neck and heard her crying. Loudermilk returned to the bedroom, leaving the door partially open. She continued to hear Chavira crying. Loudermilk said she heard Chavira making noise for 10 to 15 minutes, as if Chavira could hardly breathe.

Loudermilk said Lloyd then carried Chavira to the den at the back of the house. She said she did not know but thought Chavira was dead. Lloyd returned to the front of the house without Chavira, took trash bags from under the kitchen sink, and then went to Loudermilk's room, took her phone, and went back to the kitchen to make a call. Loudermilk said Lloyd paced back and forth until Jackson and her sister arrived. Loudermilk heard Lloyd tell Jackson, "It's going to be okay, we're going to find her." But before Lloyd left the house, Loudermilk said Lloyd told her, "You don't know Chavira and you haven't seen her."

After Lloyd left, Loudermilk said, he called and told her to pick up some jeans from the living room floor or else he would come back and kill her. She said she complied, putting the jeans in a plastic bag in her room. In their later search, officers found a trash bag containing a pair of jeans with what appeared to be attic insulation on them in a bedroom.

Detective Rose testified after Loudermilk about the police interviews and what Loudermilk said. His testimony was largely consistent with Loudermilk's. Rose said Loudermilk told him that Chavira had been crying all day, that Lloyd spanked Chavira with his hand and belt after the child wet her pants, and that Loudermilk

said she saw Lloyd holding Chavira down with his hand around her throat while Chavira made a choking sound. He quoted Loudermilk as saying, "That sound lasted for about an hour and then it stopped." Loudermilk also told him that after the noise stopped, Lloyd walked to a back room carrying Chavira; grabbed several kitchen bags; returned to the back room; asked for her cell phone; and then paced back and forth. Loudermilk also told Rose that two females came to the house and talked to Lloyd. She heard crying and "mention of something about the park and we'll find her."

After the State rested, Lloyd called Detective Hightower and Officer Nagy to testify about Loudermilk's police interview. Nagy explained what he told Loudermilk during the interview to prompt her cooperation. Lloyd then moved to strike testimony, claiming Loudermilk's statements were coerced. We will discuss this motion when addressing Lloyd's claim of error regarding its denial.

Lloyd testified in his defense and substantially contradicted Loudermilk's testimony. He told the jury on the day Chavira disappeared he needed to clean an area where he kept his 11 dogs. He said Loudermilk would not watch Chavira, so he brought the child with him. He said he put Chavira on the back porch, but she started crying, so he took her outside to a fenced-in backyard accessible from the street. Lloyd said he went into the house for cleaning supplies and when he returned, Chavira was gone. Lloyd testified he ran around the house and down the street but could not find her. He said he called Jackson to tell her what happened but could not reach her, so he called her friend and lied by telling her Chavira was lost in the park.

Lloyd denied asking Loudermilk to pick up any clothes or threatening to kill her. He admitted spanking Chavira with a belt the day she disappeared, explaining she had wet the bed and this was his potty training process. But he said, aside from this spanking, he did not hurt Chavira or place her inside the trash bags where police found her body. He denied killing Chavira and did not know who did.

Deputy Coroner Ronald Distefano performed Chavira's autopsy. He concluded she died of asphyxiation, explaining this could have been caused by covering her mouth and nose; a constricting

force around her neck; compression of her chest and abdomen; or an environment with limited or no oxygen. Distefano noted Chavira's asphyxiation caused brain swelling, which he said was a significant symptom because such swelling takes time to occur. He concluded the swelling indicated hours elapsed between death and the initial asphyxiation injury to the brain. He also determined Chavira had early evolving pneumonia, which occurs when death is prolonged.

The jury unanimously convicted Lloyd of first-degree murder under both prosecution theories: premeditated murder and felony murder in the course of child abuse. The jury also convicted him of child abuse.

After the convictions, the State moved to impose a mandatory minimum sentence of 50 years' imprisonment before parole eligibility. The district court judge granted the motion and imposed the hard 50 sentence for the premeditated first-degree murder conviction and 128 months, to run consecutively, for child abuse.

To impose the hard 50 term, the judge found two aggravating circumstances under the statute. First, the judge found Lloyd was previously convicted of a felony for an aggravated assault against Loudermilk, which the judge determined had inflicted great bodily harm. See K.S.A. 21-4636(a). Second, the judge found Lloyd committed the child's murder in an especially heinous, atrocious, or cruel manner. See K.S.A. 21-4636(f). Finally, the trial judge found these two statutory aggravators outweighed Lloyd's mitigation evidence.

Lloyd timely appealed, initially arguing: (1) The district court erred in denying his motion to strike Loudermilk's pretrial statement and trial testimony; (2) insufficient evidence supported the premeditated first-degree murder conviction; and (3) the district court erred in admitting evidence of prior wrongdoing contrary to K.S.A. 2009 Supp. 60-455. But after the parties had briefed and argued those issues, the United States Supreme Court extended the rule announced in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), and held the right to a jury trial under the Sixth Amendment to the United States Constitution requires that any fact increasing a mandatory minimum sentence

necessarily increases the penalty for a crime and, therefore, is an " 'element' " that must be submitted to a jury and proved beyond a reasonable doubt. *Alleyne*, 570 U.S. at ___, 133 S. Ct. at 2151, 2162-63. Lloyd then moved for supplemental briefing, challenging the constitutionality of his hard 50 sentence as violative of his right to a jury trial. We granted that motion and then requested a second supplemental brief regarding the possible application of harmless error.

Our jurisdiction is proper under K.S.A. 22-3601(b)(1) (off-grid crime; life sentence).

## MOTION TO STRIKE

During trial, Lloyd moved to strike Loudermilk's pretrial statements to Detective Rose and her trial testimony, arguing both were coerced. He complains on appeal the district court violated his rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution. Lloyd seeks alternative remedies: (1) remand to the district court for an evidentiary hearing on whether Loudermilk's pretrial statements were coerced; or (2) appellate review of the trial record and a determination that the statements were coerced. Lloyd asks if this court finds her testimony coerced that we remand for a new trial without Loudermilk's pretrial statement or testimony admitted as evidence. We hold the district court properly denied the motion to strike.

*Standard of Review*

Subject to exclusionary rules, an appellate court reviews the grant or denial of a motion to strike concerning the admission or exclusion of evidence for abuse of discretion. *State v. Bowen*, 254 Kan. 618, 624, 867 P.2d 1024 (1994) (citing *State v. Friberg*, 252 Kan. 141, Syl. ¶ 5, 843 P.2d 218 [1992]). A district court abuses its discretion when: (1) no reasonable person would take the view adopted by the judge; (2) a ruling is based on an error of law; or (3) substantial competent evidence does not support a finding of fact on which the exercise of discretion is based. *State v. Maestas*, 298 Kan. 765, 785, 316 P.3d 724 (2014).

*Additional Facts Regarding the Motion*

We begin by reviewing when the motion was made and what exactly counsel requested from the district court because this plays prominently in the analysis. We note there was no written motion either before or during trial.

Lloyd first presented the oral motion to strike during the defense's case-in-chief. Loudermilk and Rose had already testified as part of the State's case, and the State had rested. Lloyd called Detective Hightower and Officer Nagy as defense witnesses. Both described Nagy's interview with Loudermilk. Lloyd's counsel then advised the district court Lloyd had provided her with caselaw that a witness statement resulting from police threat or coercion may be suppressed. Counsel argued, "The evidence has show[n] that [Nagy] made comments to [Loudermilk] that she'd go to prison, that she was facing a murder charge, [and that] gave her promises in exchange for her statement of helping her get her child out of [protective] custody." Counsel volunteered that the case citation from her client did not support this argument and further explained she had been unable to find other authority. Nevertheless, she moved that the court

"suppress or strike *any testimony of Tameika Loudermilk*, based on the fact that she gave a statement under—she was under—I think she was under duress, she was coerced, she was made promises, and she was threatened in order to implicate Mr. Lloyd . . . as the perpetrator of the murder in this case." (Emphasis added.)

The State responded that the motion lacked legal authority and noted Loudermilk's testimony actually contradicted the coercion theory. The district court asked defense counsel which statements were at issue because Loudermilk not only gave a pretrial statement that multiple witnesses discussed at trial, but she had also testified in person at trial about what she saw on the day Chavira died. The court further observed Loudermilk's testimony was generally consistent with her pretrial statement. In response, Lloyd's counsel said:

"Suppress the statements . . . from the time that she was threatened by Officer Nagy on, is my client's request. That would be all matters that implicate Mr. Lloyd that she gave to Detective Rose, Judge. And I guess *the cure I'm asking is an instruction to the jury to disregard any statements that she would have made to*

*Detective Rose.* I concur that she said she didn't feel duress, nor did she remember that they did these things to her. I've now put on the evidence from the officer that he did, indeed, say these things." (Emphasis added.)

The district court then indicated it was struggling to understand the motion. The court rhetorically asked how it should deal with Loudermilk's trial testimony insofar as it was consistent with her pretrial statements, but it did not wait for a response. It took the matter under advisement, promising to rule on the motion before the case went to the jury.

The court returned to the motion to strike at the close of evidence. The judge repeated his concerns and gave counsel the weekend to further develop what was being asked and provide any supporting arguments, stating:

"As I've thought about the motion that has been presented that I have taken under advisement, it occurs to me that the statements made by a witness, I don't think, are subject to the same constitutional issues as those made by parties. There is a reason that we have the constitutional safeguards in place against self-incrimination and voluntary statements made by a defendant who is charged with a crime. I think a whole different analysis applies to a witness, and it seems to me that from—the viewing of the witness statements were in the general realm of whether or not—in the general direction of the Court whether or not to admit that evidence, and it seems to me that what's at issue is the credibility of the witness and the weight and credit that the jury should give that. So I'm not sure that the—an argument that you would typically make if you were a defendant trying to suppress the statements that you've made necessarily translates into statements made by a third party witness. *If you can find a case that suggests that the same analysis applies, I mean, I'd be interested in reading that.*

"The second concern that I have is that it seems to me that we need to have a contemporaneous objection to these things coming in because the jury has already heard all this stuff and it's going to be difficult to un-ring the bell, and the— assuming that there is case law that exists or legal principles that would suggest that these statements should be suppressed, it seems to me that, because there was not a contemporaneous objection, it's going to be difficult to un-ring that bell. *In any event, that's kind of my initial read on it. I'm happy to give you the weekend to do whatever research that you want to do, and then I'll be glad to read any cases that you want to present on Monday. I guess I'll hold my ruling open until Monday until we've had a chance to look into it in a fuller fashion.*" (Emphasis added.)

The trial record contains no further discussion on this motion or any indication defense counsel accepted the court's invitation to

provide additional authority. And the defense made no objection at the instructions conference to the lack of a jury instruction to disregard Loudermilk's statements to Rose. But Lloyd raised the issue again in his postconviction motion for a new trial without any supporting argument. Now on appeal, Lloyd claims the district court erred as a matter of law because admission of a coerced witness statement violates a defendant's due process rights.

*Discussion*

At the outset we note Lloyd is correct that a conviction based, in whole or in part, on a witness' coerced statement may deprive the defendant of due process. *State v. Daniels*, 278 Kan. 53, 65, 91 P.3d 1147, *cert. denied* 543 U.S. 982 (2004); see also *United States v. Gonzales*, 164 F.3d 1285, 1289 (10th Cir. 1999) ("defendants' due process rights would be implicated if the subject witness was coerced into making false statements and those statements were admitted against defendants at trial"). But Lloyd presented no such authority to support the motion, which marks the first of several deficiencies when he advanced this issue.

A party disputing the admissibility of evidence should provide the district court with a specific objection or argument so that it has a fair chance to consider, as fully as possible, whether that evidence should be admitted and to avoid potentially reversible error. *State v. Chanthaseng*, 293 Kan. 140, 144, 261 P.3d 889 (2011); see K.S.A. 60-404; see also 23A C.J.S., Criminal Law § 1673, pp. 189-90 (motion to strike "must fairly inform the trial court, as well as the party offering the evidence, of the specific reason or reasons the party believes the evidence should be excluded, so the party offering the evidence can respond appropriately and the trial court can make a fully informed ruling"). Lloyd's counsel not only declined the court's invitation to submit relevant authority, but actively suggested her client's motion lacked merit.

Similarly, we struggle—as did the district court—to determine precisely what testimony Lloyd argues should have been stricken. There is not an easily identifiable question-and-answer sequence that would lend itself to easy management of the claimed problem. Instead, Lloyd attempted at times to cast a wide net prohibiting

the after-the-fact admissions of some, if not all, testimony from several witnesses, without any real articulation as to what was in controversy.

"Objections to evidence should designate the particular portion deemed objectionable." 23A C.J.S., Criminal Law § 1670, pp. 186-87. And Lloyd failed to adequately specify the testimony he claimed should have been stricken. At one point, Lloyd sought to strike "any testimony" from Loudermilk, then later to suppress "the statements . . . from the time that she was threatened by Officer Nagy on," and then finally claimed the cure was to instruct the jury to disregard "any statements that she would have made to Detective Rose." This lack of articulation renders the argument nonsensical in the context of what had preceded the motion, especially since the district court gave the defense ample opportunity to address the issue more comprehensively.

But even if Lloyd had presented his motion to strike in a better form, the district court did not abuse its discretion by concluding it was untimely. In *State v. Roach*, 223 Kan. 732, 737, 576 P.2d 1082 (1978), this court addressed whether a district court appropriately denied a defendant's motion to strike his previous trial testimony about his willingness to take a polygraph test when the polygraph results were later available and about to be admitted into evidence. The court noted the proper procedure would have been to move to strike the unresponsive answer promptly after it was interjected into the record, observing that once the defendant testified he would take a polygraph test "its impact was obvious." 223 Kan. at 737. While holding it was not error to deny the motion, this court cautioned that when addressing a motion to strike "a question will always linger as to whether the testimony can be erased from the memories of the jurors." 223 Kan. at 737.

The same analysis applies to Lloyd's motion, especially given the volume of testimony at issue and the motion's belated timing. Lloyd sought (at least at one point in the proceedings) to exclude most, if not all, testimony from the State's only witness to the crime, as well as her prior statements to officers about what she witnessed. The motion came after Loudermilk testified and other witnesses had reiterated what she said. It would have been difficult—at

best—to instruct the jury on what testimony to ignore, and there are legitimate questions whether a diligent jury could effectively untangle what evidence was eligible for its consideration after it was admitted without objection. Moreover, the timing of Lloyd's motion—after the State had rested—would have prevented the State from adjusting its evidentiary presentation had the motion been granted. See *State v. Hunt*, 223 N.C. 173, 176, 25 S.E.2d 598 (1943) (district court did not abuse its discretion by denying motion to strike evidence lodged after State had rested its case). Under the circumstances, we hold the district court did not abuse its discretion by denying the motion to strike as untimely.

## SUFFICIENT EVIDENCE OF PREMEDITATED FIRST-DEGREE MURDER

Lloyd next argues insufficient evidence supported the premeditation and intent elements underlying his premeditated first-degree murder conviction. And from this premise he argues the conviction and, consequently, his hard 50 sentence (a sentence imposed for premeditated murder but not felony murder) must be vacated. See K.S.A. 21-4635(b). We hold the evidence was sufficient to support the conviction.

### Standard of Review

When sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after reviewing all the evidence in a light most favorable to the prosecution, the appellate court is convinced a rational factfinder could have found the defendant guilty beyond a reasonable doubt. Appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations. *State v. Qualls*, 297 Kan. 61, 66, 298 P.3d 311 (2013).

### Discussion

To obtain this premeditated first-degree murder conviction, the State had to prove Lloyd killed Chavira intentionally and with premeditation. See K.S.A. 21-3401(a); *State v. Scott*, 271 Kan. 103, 108, 21 P.3d 516, *cert. denied* 534 U.S. 1047 (2001). The district

court properly instructed the jury on the following definition of premeditation from PIK Crim. 3d 56.04(b):

"Premeditation means to have thought the matter over beforehand, in other words, to have formed the design or intent to kill before the act. Although there is no specific time period required for premeditation, the concept of premeditation requires more than the instantaneous, intentional act of taking another's life."

Premeditation does not necessarily mean an act is planned, contrived, or schemed beforehand; rather, it indicates a time of reflection or deliberation. *State v. Holmes*, 278 Kan. 603, 632, 102 P.3d 406 (2004). Premeditation and deliberation may be inferred from the established circumstances of a case, provided the inference is reasonable. *State v. Scaife*, 286 Kan. 614, 617, 186 P.3d 755 (2008).

Our caselaw identifies factors to consider when determining whether the evidence gives rise to an inference of premeditation, including: (1) the nature of the weapon used; (2) the lack of provocation; (3) the defendant's conduct before and after the killing; (4) any threats or declarations of the defendant before or during the occurrence; and (5) the dealing of lethal blows after the deceased was felled and rendered helpless. 286 Kan. at 617-18. But the analysis is not driven by the number of factors present in a particular case; in some cases, one factor alone may be compelling evidence of premeditation. *State v. Cook*, 286 Kan. 1098, 1102, 191 P.3d 294 (2008).

Lloyd contends the State's only theory of premeditation, as articulated in opening and closing statements, was that Chavira was alive when Lloyd put her inside the trash bags, and he argues the evidence does not support this theory. But the State argues it proved Chavira was alive when placed inside the bags and points to other evidence supporting premeditation.

At the outset we note both sides focus too narrowly on the State's primary argument that Chavira was alive when stuffed into the trash bags. Resolving this issue requires reviewing all evidence considered by the jury to decide if substantial competent evidence supports premeditation. We are not constrained by what the State argued in its opening or closing statements. See *Cook*, 286 Kan. at

1103 (prosecutor's arguments do not determine the issue as to whether sufficient evidence supported premeditation element); see also *State v. Bennington*, 293 Kan. 503, 530, 264 P.3d 440 (2011) (opening and closing statements are not evidence). Instead, we must determine whether the testimony and physical evidence in the record support findings for the State on each element of premeditated first-degree murder, as defined in the jury instructions.

In this case, the evidence when viewed in the light most favorable to the State and considering the nonexclusive factors set out above, amply supports a premeditation finding. For example, Loudermilk testified Lloyd placed his hand around Chavira's neck, causing her to cry and then experience labored breathing for 10 to 15 minutes. Manual strangulation is strong evidence of premeditation because it provides time for deliberation. See *State v. Gunby*, 282 Kan. 39, 64-65, 144 P.3d 647 (2006); *State v. Jones*, 279 Kan. 395, 403, 109 P.3d 1158 (2005) (same); see also *Scott*, 271 Kan. at 111 (when finding premeditation jury could conclude defendant's state of mind changed during the violent episode, including at any time during the strangulation); *State v. Brown*, 234 Kan. 969, 972-73, 676 P.2d 757 (1984) (evidence of premeditation sufficient when severely beaten victim was killed by strangulation). This alone was sufficient evidence for the jury to conclude Lloyd intended to kill the child, but there is more.

The evidence also supported the State's theory that Chavira was alive when Lloyd retrieved trash bags from the kitchen and sealed Chavira inside them. The coroner testified at least 2 to 3 hours elapsed between Chavira's initial asphyxial brain injury and her death. And the coroner also testified he could not tell whether the child died from the strangulation Loudermilk described or being placed in an environment with limited or no oxygen—the knotted trash bags inside the sofa cushion cover. The coroner testified death by asphyxiation could occur either way. He further testified Chavira had early evolving pneumonia, which indicated hours elapsed before her death. The jury could easily infer premeditation by Lloyd's intentional creation of an oxygen-deprived environment

when he stuffed her into the trash bags and tied them shut, given the extended time between the initial asphyxiation and death.

And as to provocation, there is none. Chavira's age (17 months) proves her helplessness. She was unable to protect herself from or prevent her injuries and death. In fact, the coroner testified Chavira had few injuries because of her inability to resist. See *State v. Hermosillo*, 272 Kan 589, 593, 35 P.3d 833 (2001) (noting evidence of an inability to resist given the strangulation victim's poor health). In addition, Lloyd's actions, both before and after Chavira's death, provide further evidence of premeditation. See *Scott*, 271 Kan. at 110 (defendant's "affirmative and intentional steps to destroy and conceal evidence" indicates premeditation). The State presented evidence Lloyd placed Chavira in three knotted trash bags, stuffed her inside a sofa cushion cover, and hid her in the attic. He then told Jackson he had lost Chavira in the park and asked Jackson's sister not to report Chavira missing. And he told Loudermilk, "You don't know Chavira and you haven't seen her," and then fled.

Lloyd also argues the State presented insufficient evidence of his intent to kill, but that too lacks merit. He contends the forensic and circumstantial evidence, as well as Loudermilk's testimony, pointed to an accidental killing and was most consistent with a scenario in which Chavira's crying and his unrealistic expectations for her behavior frustrated him. This, he argues, led him to choke her to stop the crying—not to kill her. In other words, the child's death was just a terrible accident. To support this argument, Lloyd cites *People v. Haley*, 34 Cal. 4th 283, 309-12, 17 Cal. Rpt. 3d 877, 96 P.3d 170 (2004). But *Haley* is distinguishable and provides no support for Lloyd's position.

In *Haley*, the State charged defendant with first-degree murder. To obtain an enhanced sentence (death or life without parole), the State alleged a special circumstance—defendant killed while committing several statutorily enumerated felonies. Under applicable California law, to prove the felony-murder special circumstance, the State had to prove the defendant intended to kill his victim. A jury convicted Haley and sentenced him to death. On appeal, the California Supreme Court affirmed the first-degree murder con-

viction, reversed the special circumstances finding, and set aside the death penalty. 34 Cal. 4th at 309-10.

Haley admitted strangling his victim, but the court reasoned that while the evidence could support an intent-to-kill finding, it was also consistent with the defendant's claims that he was only attempting to make the victim stop screaming. 34 Cal. 4th at 312. And because the jury was not instructed on the intent-to-kill requirement, the special circumstance finding was defective and the death sentence had to be set aside. 34 Cal. 4th at 310.

But Lloyd offered no evidence he intended only to choke Chavira in a fit of frustration; rather, he denied any physical violence against her other than the spanking incident. And more importantly, the *Haley* court explicitly stated that "if the jury had considered whether the defendant intended to kill [the victim] and returned a finding of guilt, *that verdict would have been supported by substantial evidence*." (Emphasis added.) 34 Cal. 4th at 310. Moreover, the court specifically noted that "strangulation 'is indicative of at least a deliberate intent to kill.' " 34 Cal. 4th at 310.

In contrast to *Haley*, the district court instructed Lloyd's jury that to convict of first-degree premeditated murder, the State had to prove Lloyd intentionally killed Chavira. And even though the evidence might be argued in various ways, the jury resolved the issue with its verdict. "Intentional conduct is conduct that is purposeful and willful and not accidental." K.S.A. 21-3201(b). The district court properly instructed the jury on this definition.

Reviewing the evidence in the light most favorable to the State, we hold a rational factfinder could have found beyond a reasonable doubt that Lloyd intentionally killed Chavira with premeditation. Sufficient evidence supported Lloyd's first-degree premeditated murder conviction.

## PRIOR CRIME EVIDENCE

Lloyd's next claimed trial error concerns admission of prior crime evidence under K.S.A. 2009 Supp. 60-455. He contends such evidence was improperly admitted when Loudermilk testified, over his objection, that he shot her in the foot. He asserts two challenges to this evidence. First, he contends the evidence was irrelevant to

the crimes charged and more prejudicial than probative. He asserts the district court's failure to give a limiting instruction heightened the prejudicial effect. Second, he argues the district court admitted the evidence prematurely because it bolstered Loudermilk's credibility before it was in dispute.

. But Lloyd did not preserve this second contention for appeal because he did not state it as a basis for the objection at trial. See K.S.A. 60-404; *State v. Engelhardt*, 280 Kan. 113, 127, 119 P.3d 148 (2005) (party cannot object to evidence on one ground at trial and assert a different ground on appeal). We are left to determine whether evidence of the prior shooting was admissible under the provisions of K.S.A. 2009 Supp. 60-455, which was the version in effect during Lloyd's July trial. See L. 2009, ch. 103, sec. 12 (effective April 30, 2009); *State v. Hart*, 297 Kan. 494, Syl. ¶ 5, 301 P.3d 1279 (2013). We hold it was admissible.

*Standard of Review*

The relevant provisions of K.S.A. 2009 Supp. 60-455 state:

"(a) Subject to K.S.A. 60-447, and amendments thereto, evidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove such person's disposition to commit crime or civil wrong as the basis for an inference that the person committed another crime or civil wrong on another specified occasion.

"(b) Subject to K.S.A. 60-445 and 60-448, and amendments thereto, such evidence is admissible when relevant to prove some other material fact including motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident."

Under this court's rubric for evaluating when evidence of a prior crime is admissible under K.S.A. 2009 Supp. 60-455(a)-(b): (1) the evidence must be relevant to prove a material fact; (2) the material fact must be disputed; and (3) the probative value of the evidence must not be substantially outweighed by the risk of undue prejudice. Materiality is reviewed de novo. An abuse of discretion standard of review applies on the existence of probative value and the weighing of it against the potential for undue prejudice. *State v. Smith*, 296 Kan. 111, 123-24, 293 P.3d 669 (2012) (applying K.S.A. 60-455).

*Discussion*

At trial, Loudermilk testified about a prior shooting incident in which Lloyd had pointed a gun at her face and when she moved it away it discharged into her foot. She also explained that she did not initially tell the police Lloyd was the shooter. Before trial, Lloyd sought to exclude this testimony. In denying the motion, the district judge stated:

"Well, as I mentioned, I think that if—the fact that Ms. Loudermilk was afraid of Mr. Lloyd is a fact that is not going to be greatly contested, and it seems to me there would be a way to maybe thread the needle to allow the State to explain in a general way why that is without getting into the details of the prior shooting. *But it seems to me that if Ms. Loudermilk's credibility is going to be attacked, if there's going to be an argument to the jury that she wasn't afraid and that her testimony should be disbelieved because somebody in her position or a normal person in her position would have acted to prevent the occurrence of what she says she saw or would have behaved in a different way at the time she alleges that she saw the things that she testified to at the preliminary hearing, then I do think that the credibility of Ms. Loudermilk is clearly in issue.* And it seems to me that under those circumstances, the prior incident would ordinarily come in under K.S.A. 60-420.

"I think *Gunby* teaches that the Court has to go through the same 60-455 analysis under these circumstances, and I think that—in going through that, I think that the State should be permitted to allow Ms. Loudermilk to testify as to why she was afraid of Mr. Lloyd. I expect the defense will impeach that explanation by offering testimony, or at least, asking questions about her relationship with Mr. Lloyd after this event. And I think all of that is relevant and comes into play, too.

"So, I guess, the long way of saying that is the Motion in Limine, with respect to the prior shooting incident, will be overruled. The Court will find that it's difficult for me to limit or permit any more generalized description of what happened if her credibility is going to be impeached at trial. It seems to me, at that point, the facts and details of the prior incident become relevant, and I don't think that there's any way for me to limit the State in presenting evidence as to why Ms. Loudermilk was afraid and why she didn't—or explain to the jury why she didn't behave in a way that most jurors are going to ask, you know, why she didn't have him stop, or what she claims she saw, and so forth." (Emphasis added.)

Consistent with the court's ruling, the evidence was admitted. Lloyd lodged timely trial objections.

We must first decide if the district court erred in finding the previous shooting was material to Loudermilk's credibility. Mate-

riality is reviewed de novo. *State v. Wilson*, 295 Kan. 605, 617, 289 P.3d 1082 (2012). "In analyzing whether the evidence is material, the focus is on whether the fact at issue has a legitimate and effective bearing on the decision of the case and is in dispute." *State v. Stafford*, 296 Kan. 25, 43, 290 P.3d 562 (2012).

Notably, credibility is not one of the material facts enumerated in K.S.A. 2009 Supp. 60-455(b); but the statute's list is nonexclusive. *State v. Prine*, 297 Kan. 460, 475, 303 P.3d 662 (2013); *State v. Gunby*, 282 Kan. 39, 56, 144 P.3d 647 (2006) ("list of material facts in K.S.A. 60-455 is exemplary rather than exclusive"). And in *Gunby*, this court implicitly recognized that corroborating witness testimony could be a material fact subject to K.S.A. 60-455 scrutiny. 282 Kan. at 56 (citing *State v. Lee*, 263 Kan. 97, 104, 948 P.2d 641 [1997]). This is further supported by *State v. Trotter*, 280 Kan. 800, 810, 127 P.3d 972 (2006), in which this court, prior to *Gunby*, held that corroborating witnesses' testimonies were material when each witness had credibility issues.

The district court did not err by allowing the State to offer credibility evidence. Credibility can be a material fact under K.S.A. 2009 Supp. 60-455. In this case, Loudermilk's credibility was material because she was the State's main witness and Lloyd had expressed his intent to cross-examine her about why she did not intervene to help Chavira and why she initially lied to police that she had not seen Lloyd.

We must decide next whether the district court erred in finding the shooting incident was probative of Loudermilk's credibility. Evidence is probative if it has any tendency in reason to prove the fact. *Wilson*, 295 Kan. at 617; see K.S.A. 60-401(b). This court reviews the probativity determination for abuse of discretion. 295 Kan. at 617.

Lloyd argues the shooting was accidental; therefore it was not probative to show Loudermilk feared Lloyd. But Loudermilk's testimony indicated that Lloyd first pointed the gun directly at her face, and it was only when she motioned to get the gun away from her face that it discharged into her foot. This evidence has a tendency in reason to prove Loudermilk feared Lloyd. It also tends to explain her actions and inactions relating to Chavira's abuse and

death because even though the shooting itself may have been accidental, before the shot was fired Lloyd pointed a loaded gun at Loudermilk's face. This reasonably could be viewed as an action on his part to instill fear in her.

We must also determine whether Loudermilk's credibility was disputed. At trial, Lloyd attacked Loudermilk's credibility in his opening statement. And when the shooting incident was mentioned during the trial, defense counsel objected for the reasons discussed in the pretrial motions, which stated that Loudermilk's credibility "is surely in issue," that Loudermilk was the State's main witness, and that Lloyd planned to vigorously cross-examine her on all inconsistencies. During cross-examination, Lloyd pressed his case for impeachment of her testimony by pointing to what he argued were inconsistencies in her statements and actions. Without question, Loudermilk's credibility was in dispute.

Lloyd also argues the district court abused its discretion in its process of weighing probative value and the risk of undue prejudice. He contends the shooting incident was not probative of Loudermilk's fear because other evidence showed she did not fear Lloyd. He points out Loudermilk lived with and became pregnant by him after he shot her in the foot.

The district court did not specifically address how it weighed probative value against prejudice. But it did say it saw no other way to limit the State in explaining why Loudermilk was afraid or why she did not stop Lloyd when she saw him hurting the child. Given the State's argument that the shooting incident related to Loudermilk's credibility, the district court's statement necessarily was a determination that the evidence was probative to explain Loudermilk's behavior. Any prejudice to Lloyd would neither qualify as undue nor overmatch the evidence's probative value. He also argues the shooting-incident evidence made him appear to be the type who was violent with all family members. And while this might be true, the shooting incident did not involve harming a child and Chavira was not shot or harmed with a firearm. The jury would not be confused that Lloyd was being prosecuted for the crime against Loudermilk rather than the charged crimes. See *Smith*, 296 Kan. at 125-26.

Finally, Lloyd argues the district court failed to give a limiting instruction, which he claims heightened the prejudicial effect of this evidence. But he is mistaken because the district court instructed the jury:

"Evidence has been admitted tending to prove that the defendant committed a crime other than the present crimes charged. This evidence may be considered solely for the purposes of proving the defendant's relationship with Tameika Loudermilk."

Lloyd makes no argument as to why this particular instruction was somehow incomplete or ineffective to address his concerns about the shooting-incident testimony. Lloyd argues only—and incorrectly—that no limiting instruction was given. His arguments premised on the absence of a limiting instruction are without merit.

In conclusion, the district court did not err in admitting evidence that Lloyd had shot Loudermilk in the foot. This evidence was relevant to Loudermilk's credibility, which was a disputed material fact, highly probative, and not cumulative. It also provided a reasonable explanation for Loudermilk's actions and inactions. And the evidence's probative value was not substantially outweighed by the risk of undue prejudice.

## HARD 50 SENTENCING

Lloyd challenges his sentence on the first-degree murder conviction, claiming the district court erred in imposing a life sentence without the possibility of parole for 50 years. He contends the hard 50 statutory procedure provided in K.S.A. 21-4635 is unconstitutional in light of *Alleyne v. United States*, 570 U.S. \_\_\_, 133 S. Ct. 2151, 186 L. Ed. 2d 314 (2013). The State argues the statutory scheme is not contrary to *Alleyne* because it does not prescribe a mandatory minimum sentence or, in the alternative, that *Alleyne* is not applicable because the judicial factfinding of aggravating circumstances merely serves to inform the court's exercise of discretion. We recently decided the statute is unconstitutional in light of *Alleyne*. See *State v. Soto*, 299 Kan. 102, Syl. ¶ 9, 322 P.3d 334 (2014). Those arguments advanced by the State to the contrary are resolved in Lloyd's favor by *Soto*.

With the statute's unconstitutionality determined, we consider next the question whether Lloyd's case is appropriate for harmless error analysis or remand given *Soto*.

*Additional Facts*

The jury found Lloyd guilty of intentional, premeditated first-degree murder, which is a crime carrying a sentence of life imprisonment with parole eligibility after 25 years under K.S.A. 22-3717(b)(1). But the State moved for imposition of a hard 50 sentence based on K.S.A. 21-4635(b), which at the time of Lloyd's offense provided that the sentencing court "shall determine whether the defendant shall be required to serve a mandatory term of imprisonment of . . . 50 years or sentenced as otherwise provided by law." To make that determination, the sentencing judge was to consider evidence relevant to any statutory aggravating circumstances alleged by the State and any mitigating circumstances. K.S.A. 21-4635(c). The sentencing court was required to impose a hard 50 sentence if one or more aggravating circumstances set out in K.S.A. 21-4636 were found to exist and those aggravating circumstances were not outweighed by any mitigating circumstances. K.S.A. 21-4635(d).

The State argued the following aggravating circumstances existed: (1) previous felony conviction in which defendant inflicted great bodily harm, disfigurement, dismemberment, or death of another; (2) commission of the crime in order to avoid or prevent a lawful arrest or prosecution; (3) commission of the crime in an especially heinous, atrocious, or cruel manner; (4) commission of the crime while serving a sentence of imprisonment on a felony conviction; and (5) victim killed while engaging in, or because of the victim's performance or prospective performance of, the victim's duties as a witness in a criminal proceeding.

The sentencing judge conducted a hearing on the State's motion during which the State submitted the evidence presented at trial supporting the proffered aggravating circumstances, and the State requested the court take judicial notice of Sedgwick County Case No. 07-CR-1405, which was Lloyd's conviction of aggravated assault against Loudermilk when she was shot in the foot. Lloyd

presented evidence of mitigating circumstances, see K.S.A. 21-4637, including that he was neglected and abused as a child, his mother abused drugs and was in and out of prison for most of his childhood, his age of only 23 years, and his lack of parenting skills.

The sentencing judge found two aggravating circumstances were present to subject Lloyd to a hard 50 sentence. First, the judge found Lloyd was previously convicted of a felony in which Lloyd inflicted great bodily harm, *i.e.*, the aggravated assault against Loudermilk. See K.S.A. 21-4636(a). Second, the judge found Lloyd committed Chavira's murder in an especially heinous, atrocious, or cruel manner. See K.S.A. 21-4636(f). The sentencing judge then found those aggravating circumstances were not outweighed by the mitigation evidence.

*Discussion*

In *Soto*, this court determined it would defer deciding whether a modified harmless error standard might apply to a hard 50 error until a case presented itself in which the evidence approaches the exacting standard required for that test. *Soto*, 299 Kan. at 128; see also *State v. Reyna*, 290 Kan. 666, 679-81, 234 P.3d 761 (2010) (applying framework from *Neder v. United States*, 527 U.S. 1, 119 S. Ct. 1827, 144 L. Ed. 2d 35 [1999], to find *Apprendi*-type error harmless).

Similar to Lloyd's case, Soto's hard 50 sentence was based on the sentencing judge's determination that Soto's crime was committed in an especially heinous, atrocious, or cruel manner. We noted in *Soto* that to apply a harmless error analysis it would be necessary to determine beyond a reasonable doubt the evidence as to that aggravating circumstance was uncontroverted and supported by overwhelming evidence such that a jury would have found its existence beyond a reasonable doubt. *Soto*, 299 Kan. at 126. The same problem is presented here. In addition, with the second aggravating factor found in Lloyd's case, we would have to make a similar determination whether Lloyd's prior conviction for the aggravated assault against Loudermilk resulted in "great bodily harm," when Loudermilk testified her injuries required no medical

treatment and police officers testifying about this prior incident gave no details regarding her injury.

But even if the aggravating circumstances could be sufficiently established to satisfy the required standard, we would still face concluding beyond a reasonable doubt that no rational jury would have determined that any of the mitigating circumstances in Lloyd's case would outweigh the aggravators. See *Soto*, 299 Kan. at 127 (noting "only in a rare instance could a hard 50/*Alleyne* error be harmless"). As in *Soto*, we will defer any decision whether to apply a harmless error standard until the circumstances more readily support a finding of harmless error.

Based on that determination, we must consider the State's argument that we should direct on remand that Lloyd be resentenced under the amended hard 50 sentencing scheme, which includes express provisions for retroactive application. See K.S.A. 2013 Supp. 21-6620. Lloyd, unsurprisingly, argues against that, claiming retroactive application would violate the constitutional prohibitions against ex post facto laws.

In *Soto*, 299 Kan. at 128-29, we explained this disagreement is not yet ripe for judicial determination. We continue to adhere to that view in Lloyd's case. Accordingly, we hold only that Lloyd's hard 50 sentence was imposed in violation of his Sixth Amendment right to a jury trial, so that his sentence must be vacated and his case remanded for resentencing as to that conviction. The parties are not foreclosed from arguing about application of the amended statute at resentencing in the district court.

Finally, we address Lloyd's claim that the evidence presented by the State was insufficient to support a finding that (1) Loudermilk suffered great bodily harm, disfigurement, or dismemberment to provide the K.S.A. 21-4636(a) aggravating factor; and (2) Chavira was placed in the plastic bags while she was still alive to provide the K.S.A. 21-4636(f) aggravating factor. Lloyd concedes the evidence was sufficient that the child was very young at the time of her death and that she was mistreated before she died. As in *Soto*, we address these arguments because if the district court determines K.S.A. 2013 Supp. 21-6620 applies at resentencing, there is an issue under section (e) that the State would be precluded from

pursuing a hard 50 sentence if this court had vacated Lloyd's sentence for lack of sufficient evidence to support the aggravating circumstances. See *Soto*, 299 Kan. at 129-30.

In light of *Alleyne*, we review all the evidence in a light most favorable to the prosecution and apply the beyond-a-reasonable-doubt standard of proof in considering this sufficiency challenge. *Soto*, 299 Kan. at 129. Based on this standard, we hold that a rational factfinder could find beyond a reasonable doubt that Lloyd killed Chavira in an especially heinous, atrocious, or cruel manner and/or was previously convicted of a felony in which Lloyd inflicted great bodily harm or disfigurement. Consequently, the sole reason we are vacating Lloyd's hard 50 life sentence is because it was imposed in violation of his Sixth Amendment right to a jury trial, as interpreted in *Alleyne*.

Convictions affirmed, sentence vacated, and case remanded for resentencing.

* * *

JOHNSON, J., dissenting: I respectfully disagree with the majority's determination that the State met its burden of proving beyond a reasonable doubt all of the material elements of premeditated first-degree murder. Specifically, the State failed to prove the requisite premeditated intent to kill.

In my view, the majority's decision falls within the ambit of the admonition that most of us first heard in law school: Bad facts make bad law. The urge to maximize the punishment for any person who would commit the cowardly and heinous act of fatally abusing an infant, especially when the culprit cavalierly neglects to obtain medical help for the suffering child, can be powerfully seductive. Yet, "[u]nder our theory of criminal jurisprudence in this nation, the defendant is clothed with a presumption of innocence until he is proven to be guilty beyond a reasonable doubt by the State." *State v. Williams*, 229 Kan. 646, 663-64, 630 P.2d 694 (1981). In this trial, the *reasonable* inferences to be drawn from the circumstances that the State actually proved, as opposed to the State's speculative guess as to what *might* have happened, supported no more than a conviction for felony first-degree murder based upon

child abuse. See *State v. Spear*, 297 Kan. 780, 791, 304 P.3d 1246 (2013) (quoting *United States v. Spirk*, 503 F.3d 619, 623 [7th Cir. 2007]) (acknowledging that "many courts have observed that '[a] guess is not proof beyond a reasonable doubt' "). If one believes that the punishment for Lloyd's emotionally disturbing act should be greater than is currently provided by statute for felony murder, the remedy lies with the legislature rather than with a judicial dilution of the State's beyond a reasonable doubt burden of proof.

The majority begins by rejecting the notion that we are bound by the State's argument that premeditation could be inferred from the fact that the victim was alive when Lloyd placed the child in the plastic bags. I must confess to being confused as to when this court believes that a party is bound by the argument that the party chose to make in the trial court. Moreover, under the first issue, the majority faults defense counsel for not precisely designating the portion of Tameika Loudermilk's testimony that the defense claims was objectionable, but then the majority proceeds to manufacture its own theory of prosecution on inferred premeditation that involves a different homicidal act—manual strangulation—than the prosecutor chose to argue—suffocation in plastic bags. To me, that tack of holding the defense to a different standard than the prosecution with respect to the waiver or abandonment of unbriefed arguments suggests a presumption of guilt, rather than a presumption of innocence. Moreover, the majority's citation to the holding that a prosecutor's argument in opening statement or closing argument is not evidence does not alter the rule with respect to the arguments that are made or not made about the actual evidence, *i.e.*, a point not argued in an appellate brief is deemed waived or abandoned. See, *e.g.*, *Cooke v. Gillespie*, 285 Kan. 748, 758, 176 P.3d 144 (2008).

I am also perplexed by the majority's reliance on this court's special rule of premeditation, which the majority states as: "Manual strangulation is strong evidence of premeditation because it provides time for deliberation." 299 Kan. at 634. The only way in which that rule makes any sense is if the defendant continues the manual strangulation until the victim dies. In other words, the strangler must have formed the premeditated intent to kill during the time

it takes to effect death by manual strangulation because the strangler kept at it until death did occur, notwithstanding the opportunity to reflect and stop. Continuing that argument, if the defendant did not form a premeditated intent to kill during the manual strangulation, surely he or she would have ceased the choking before the victim died. Here, that is precisely what happened; Lloyd stopped choking the child before the child died. There is no evidence from which one could infer otherwise. In addition, unless Lloyd was medically well-informed, he could not have been assured that the child would experience brain swelling and the early onset of pneumonia from the unconsummated manual strangulation or that such conditions would inevitably lead to death, *i.e.*, he could not have known that the cessation of choking prior to death would nevertheless be fatal. Accordingly, Lloyd's cessation of choking before the child died is actually strong evidence of an absence of a premeditated intent to kill. This alone would be sufficient reason for me to reject the majority's opinion, but there is more.

The majority overstates the evidence when it declares that "[t]he evidence also supported the State's theory that [the child] was alive when Lloyd retrieved trash bags from the kitchen and sealed [the child] inside them." 299 Kan. at 634. I see no evidence that the child *was* alive when placed in the bags. Rather, the "supporting" evidence the majority finds persuasive would, at best, provide the basis for an *inference* that the child *might* have been alive when sealed in the bags. The coroner's testimony proved nothing but possibilities. The testimony that 2 to 3 hours elapsed between strangulation and death was not accompanied with a proven timeline that would establish that the child *had* to be alive when sealed in the bag. To the contrary, the coroner opined that the child's asphyxiation could have been caused by *either* the earlier strangulation or the deprivation of oxygen from being sealed alive in the bags.

More importantly, however, the State's burden was not simply to create a reasonable inference that the child was alive when placed in the bags. The element the State had to prove was that Lloyd intentionally killed the child with premeditation. Therefore, after arguing that one could infer the circumstance that the child

was alive when placed in the bags, the State's next chore was to convince the jury that the circumstance of the child being alive created a reasonable inference that Lloyd intended to kill the child with premeditation when he placed the live child in the bags. Of course, that would also necessitate an intervening inference that Lloyd knew the child was still alive because one does not intend to kill a corpse. Moreover, that intervening inference is not a patently obvious assumption, given that the only eyewitness, Loudermilk, testified that she thought the child was dead when Lloyd carried the child to the kitchen before retrieving the trash bags.

In short, to support its theory of prosecution, the State was required to stack inference upon inference. In *Williams*, 229 Kan. at 648-50, this court discussed inference stacking in the context of the issue of the sufficiency of the evidence:

"In the original opinion we recited rules of law which guide the court in the determination of whether the record discloses sufficient evidence to support the verdict. Those rules are repeated here:

'The rules used to determine sufficiency of the evidence are frequently cited. A trial judge in passing on a motion for judgment of acquittal must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact therefrom, a reasonable mind, or rational trier of facts, might fairly conclude guilt beyond a reasonable doubt. *State v. Mack*, 228 Kan. 83, 89, 612 P.2d 158 (1980), and cases cited therein. In a criminal action where the defendant contends the evidence at trial was insufficient to sustain a conviction, the standard of review on appeal is: Does the evidence when viewed in the light most favorable to the prosecution convince the appellate court that a rational factfinder could have found the defendant guilty beyond a reasonable doubt? *State v. Peoples*, 227 Kan. 127, 133, 605 P.2d 135 (1980), and cases cited therein. In considering the sufficiency of evidence to sustain a conviction, this court looks only to the evidence in favor of the verdict, it does not weigh the evidence and if the essential elements of the charge are sustained by any competent evidence the conviction must stand. *State v. Peoples*, 227 Kan. at 133; *State v. Racey*, 225 Kan. 404, 407, 590 P.2d 1064 (1979). A conviction of even the gravest offenses may be sustained by circumstantial evidence. *State v. White & Stewart*, 225 Kan. 87, Syl. ¶ 14, 587 P.2d 1259 (1978).' 229 Kan. at 296.

"Convictions based upon circumstantial evidence, as in the instant case, can present a special challenge to the appellate court. Juries are permitted to draw *justifiable* inferences from proven circumstances and established facts; but the

appellate court must determine whether findings based upon inferences are *justifiable* by applying additional rules of law.

"In *State v. Gobin*, 216 Kan. 278, 531 P.2d 16 (1975), this court reversed a felony conviction of attempting to steal swine. The proof in that case was entirely circumstantial, and we recited applicable appellate rules including the following: 'Presumptions and inferences may be drawn only from facts established and presumption may not rest upon presumption or inference on inference.' 216 Kan. 280; see *State v. Doyle*, 201 Kan. at 488; *State v. Ragland*, 170 Kan. 346, 351, 226 P.2d 251 (1951).

"Black's Law Dictionary 917 (4th ed. rev. 1968) defines an inference as '[a] process of reasoning by which a fact or proposition sought to be established is deduced as a logical consequence from other facts, or a state of facts, already proved or admitted.' See *Duncan v. Railway Co.*, 82 Kan. 230, 233, 108 Pac. 101 (1910) (where a discussion of inference and presumption is made). The presumption referred to is the permissive type, not the mandatory or conclusive presumption. See Stumbo, *Presumptions—A View at Chaos*, 3 Washburn L.J. 182, 190-91 (1964).

"The rule which forbids the basing of an inference on an inference has received treatment and analysis in Annot., 5 A.L.R.3d 100. In Kansas, the rule has been cited most frequently in civil cases, but it is recognized as 'doubly applicable in criminal cases.' *State v. Doyle*, 201 Kan. at 488, and cases cited therein.

"The rule is restated in 1 Wharton's Criminal Evidence § 91, pp. 150-51 (13th ed. 1972):

'Another way, perhaps, of verbalizing the rule prohibiting an inference on an inference and a presumption on a presumption is the rule, as stated by some courts, that where reliance is placed upon circumstantial evidence, the circumstances in question must themselves be proved and cannot be inferred or presumed from other circumstances.'

"The rule against basing an inference on an inference has been discussed in more detail in Kansas civil cases. This court has said that what is meant by the rule forbidding the basing of one inference upon another inference is that an inference cannot be based upon evidence which is too uncertain or speculative or which raises merely a conjecture or possibility. *Virginia Surety Co. v. Schlegel*, 200 Kan. 64, 434 P.2d 722 (1967). Permissible presumptions or inferences, as understood in the law of evidence, must have substantial probative force as distinguished from surmise. *Farmers Ins. Co. v. Smith*, 219 Kan. 680, 689, 549 P.2d 1026 (1976). While reasonable inferences may be drawn from the facts and conditions shown they cannot be drawn from facts or conditions merely imagined or assumed. *Duncan v. Railway Co.*, 86 Kan. 112, 119 Pac. 356 (1911)."

Just like in the *Williams* case, here the State impermissibly stacked inferences in its attempt to establish the elements it was required to prove beyond a reasonable doubt to obtain a conviction

for premeditated first-degree murder. The inference that Lloyd formed the intent to kill the child, after having thought the matter over beforehand, *i.e.*, after premeditation, was impermissibly based upon evidence which was too uncertain or speculative or which raised merely a conjecture or possibility. It was unreasonable to draw the premeditated intent to kill inference from facts and conditions which were merely imagined or assumed, rather than themselves *proved,* not merely surmised.

Accordingly, I would reverse Lloyd's premeditated first-degree murder conviction based upon the State's failure to meet its burden of proving all of the material elements of that crime, and I would remand for sentencing on the alternative conviction for felony murder.

LUCKERT, J., joins the foregoing dissent.