IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 115,834

STATE OF KANSAS,
*Appellee*,

v.

JONELL K. LLOYD,
*Appellant.*

SYLLABUS BY THE COURT

1.

Basing a conviction in whole or in part on the coerced statement of a witness may deprive a criminal defendant of due process.

2.

K.S.A. 2017 Supp. 21-6624(a) contains no language requiring the State to prove that bodily harm was an element of the felony serving as an aggravating factor.

3.

K.S.A. 2017 Supp. 21-6624(a) requires the State to prove only that the previous offense was a felony and that, during the course of committing that felony, the defendant inflicted great bodily harm, disfigurement, dismemberment, or death on another.

Appeal from Sedgwick District Court; JEFFREY E. GOERING, judge. Opinion filed August 10, 2018. Affirmed.

*Clayton J. Perkins,* of Kansas Appellate Defender Office, argued the cause and was on the briefs for appellant.

1

*Lesley A. Isherwood*, assistant district attorney, argued the cause, and *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

ROSEN, J.:  Jonell K. Lloyd was convicted of first-degree premeditated murder, felony murder, and abuse of an infant victim. On direct appeal, this court affirmed his conviction but remanded the case to the trial court for resentencing, with a jury impaneled to make specific factual findings supporting or not supporting an enhanced sentence. He now appeals from the newly imposed sentence.

FACTS

The facts supporting the conviction were set out in *State v. Lloyd*, 299 Kan. 620, 325 P.3d 1122 (2014):

"Chavira Brown was 17 months old when she was found dead in the attic of Lloyd's house. She was born to Jessica Jackson, who believed Lloyd was the child's father, so he occasionally watched Chavira. Lloyd lived with his girlfriend, Tameika Loudermilk, and their 8-month-old son.

"As Jackson testified at trial, Lloyd left her a voicemail message on July 31, 2008, saying he had lost Chavira at a city park. Jackson and her sister went to Lloyd's house, where he explained he had taken Chavira and his son to the park but lost her while changing the boy's diaper. Lloyd would later admit he fabricated this explanation. He later testified he lost Chavira at his house but did not want to say so because he sold drugs there. Jackson testified Lloyd asked the two women not to call the police because he had outstanding arrest warrants. Jackson's sister, however, reported the child missing,

2

and then the two women went to the park to look for Chavira. Lloyd admits he left the house.

"When Jackson arrived at the park about 8 p.m., police officers were already there. After speaking with her, an officer drove Jackson to Lloyd's house, where the officer talked with Loudermilk, who initially denied knowing Lloyd. But after another person told officers Lloyd lived there, Loudermilk admitted Lloyd had been at the house, but she did not know his whereabouts and had not seen Chavira recently. Police arrested Loudermilk for obstruction and took her into custody, which led to a series of interviews at the police station that began after midnight. Loudermilk's statements to investigators and her trial testimony were central to the investigation and prosecution and play prominently in the conviction-related issues on appeal.

"Detective Brian Hightower first interviewed Loudermilk. She initially repeated that she did not know Chavira's whereabouts, but she did describe how Lloyd had shouted at Chavira because she wet herself. At 2:53 a.m., Officer Michael John Nagy took over the interview and admits he was 'pretty rough' in his questioning in order to get Loudermilk to tell where Chavira was. Nagy was aware Loudermilk's infant son was in protective custody after her arrest, so he told Loudermilk he would help get her son back from protective custody if she cooperated. He also told her she would 'be in a world of hurt' if she did not help locate Chavira. But Loudermilk offered no additional information. Nagy then changed tactics.

"Nagy told Loudermilk she would go to jail for a long time if something bad happened to Chavira; and, if that happened, her son would go into 'the system' and she would be unable to see him. Toward the end of this interview, Nagy told Loudermilk he was going to get the truth from another witness who had talked to Lloyd and knew what happened. Nagy told her to think about whether charging her with murder was fair to her and her son. He then left the room and Detective Lennie Rose entered. At around 4:45 a.m., Loudermilk made statements incriminating Lloyd—most critically, she said she thought Chavira was in the attic of the house.

3

"Officers secured a search warrant and discovered in the attic what they initially described as a black bag, which was actually a sofa cushion cover filled with three black plastic trash bags, one bag inside the other, and 'knotted, tied.' The innermost bag contained Chavira's body.

"The State charged Lloyd alternatively with first-degree premeditated murder and felony murder with the underlying felony of child abuse. It also charged him with child abuse.

"At trial, Loudermilk testified as a State witness. She said she was at home the day Chavira died and mainly stayed in her bedroom. She said she saw Lloyd in the living room hitting Chavira with a belt for about 20 minutes because the child had wet herself. Loudermilk did nothing to stop him. She said she walked through the living room later and saw Lloyd with his hand around the backside of Chavira's neck and heard her crying. Loudermilk returned to the bedroom, leaving the door partially open. She continued to hear Chavira crying. Loudermilk said she heard Chavira making noise for 10 to 15 minutes, as if Chavira could hardly breathe.

"Loudermilk said Lloyd then carried Chavira to the den at the back of the house. She said she did not know but thought Chavira was dead. Lloyd returned to the front of the house without Chavira, took trash bags from under the kitchen sink, and then went to Loudermilk's room, took her phone, and went back to the kitchen to make a call. Loudermilk said Lloyd paced back and forth until Jackson and her sister arrived. Loudermilk heard Lloyd tell Jackson, 'It's going to be okay, we're going to find her.' But before Lloyd left the house, Loudermilk said Lloyd told her, 'You don't know Chavira and you haven't seen her.'

"After Lloyd left, Loudermilk said, he called and told her to pick up some jeans from the living room floor or else he would come back and kill her. She said she complied, putting the jeans in a plastic bag in her room. In their later search, officers found a trash bag containing a pair of jeans with what appeared to be attic insulation on them in a bedroom.

"Detective Rose testified after Loudermilk about the police interviews and what Loudermilk said. His testimony was largely consistent with Loudermilk's. Rose said Loudermilk told him that Chavira had been crying all day, that Lloyd spanked Chavira with his hand and belt after the child wet her pants, and that Loudermilk said she saw Lloyd holding Chavira down with his hand around her throat while Chavira made a choking sound. He quoted Loudermilk as saying, 'That sound lasted for about an hour and then it stopped.' Loudermilk also told him that after the noise stopped, Lloyd walked to a back room carrying Chavira; grabbed several kitchen bags; returned to the back room; asked for her cell phone; and then paced back and forth. Loudermilk also told Rose that two females came to the house and talked to Lloyd. She heard crying and 'mention of something about the park and we'll find her.'

"After the State rested, Lloyd called Detective Hightower and Officer Nagy to testify about Loudermilk's police interview. Nagy explained what he told Loudermilk during the interview to prompt her cooperation. Lloyd then moved to strike testimony, claiming Loudermilk's statements were coerced. . . .

"Lloyd testified in his defense and substantially contradicted Loudermilk's testimony. He told the jury on the day Chavira disappeared he needed to clean an area where he kept his 11 dogs. He said Loudermilk would not watch Chavira, so he brought the child with him. He said he put Chavira on the back porch, but she started crying, so he took her outside to a fenced-in backyard accessible from the street. Lloyd said he went into the house for cleaning supplies and when he returned, Chavira was gone. Lloyd testified he ran around the house and down the street but could not find her. He said he called Jackson to tell her what happened but could not reach her, so he called her friend and lied by telling her Chavira was lost in the park.

"Lloyd denied asking Loudermilk to pick up any clothes or threatening to kill her. He admitted spanking Chavira with a belt the day she disappeared, explaining she had wet the bed and this was his potty training process. But he said, aside from this spanking, he did not hurt Chavira or place her inside the trash bags where police found her body. He denied killing Chavira and did not know who did.

5

"Deputy Coroner Ronald Distefano performed Chavira's autopsy. He concluded she died of asphyxiation, explaining this could have been caused by covering her mouth and nose; a constricting force around her neck; compression of her chest and abdomen; or an environment with limited or no oxygen. Distefano noted Chavira's asphyxiation caused brain swelling, which he said was a significant symptom because such swelling takes time to occur. He concluded the swelling indicated hours elapsed between death and the initial asphyxiation injury to the brain. He also determined Chavira had early evolving pneumonia, which occurs when death is prolonged.

"The jury unanimously convicted Lloyd of first-degree murder under both prosecution theories: premeditated murder and felony murder in the course of child abuse. The jury also convicted him of child abuse." 299 Kan. at 622-26.

In that appeal, Lloyd raised three issues asserting trial errors: the evidence at trial was insufficient to support a premeditated murder conviction; Loudermilk's pretrial statements and trial testimony were the products of coercion and should have been suppressed; and evidence of another crime should not have been admitted. A majority of this court rejected the asserted trial errors and affirmed the conviction. In particular, the court elected not to address the claim of witness coercion, holding that the issue was not preserved in an adequate and timely fashion before the trial court.

The court found a sentencing violation in the trial court's imposition of a hard 50 sentence without the jury making the findings necessary to support the sentence, in violation of *Alleyne v. United States*, 570 U.S. 99, 133 S. Ct. 2151, 186 L. Ed. 2d 314 (2013). As a consequence, the case was remanded for a new sentencing hearing. 299 Kan. at 645.

The sentencing trial on remand was held in December 2015. The new jury heard no evidence significantly different from what was presented in the first trial, including the testimony of the police investigators. The State attempted to serve a subpoena on

Loudermilk to compel her to testify at the remand trial, but, despite extensive efforts, was unable to locate her. As a consequence, the trial court granted the State's motion to allow reading of her transcribed testimony from the first trial to the jury. The jury found two aggravating factors, and the court again sentenced Lloyd to a minimum term of imprisonment of 50 years, to run consecutive with the 128 months imposed for the other counts at the first trial. He timely appeals from that sentence.

ANALYSIS

Lloyd initially argues that the trial court committed reversible error when it allowed the State to present Loudermilk's pretrial statements and testimony from the first trial. Lloyd asserts that threats to include Loudermilk as a defendant in criminal charges resulting from the infant's death, as well as threats to use the incident against Loudermilk in a parental rights determination regarding her own child, undermined the voluntariness and veracity of Loudermilk's description of what she witnessed.

Loudermilk testified at the first trial how Lloyd treated Chavira before the murder, how the murder was carried out, and how Lloyd disposed of the body. In addition, statements that she made to the police investigating the death came into evidence through the testimony of police investigators. This testimony was material to the remand jury's consideration of whether Lloyd committed the crime in an especially heinous, atrocious, or cruel manner, an aggravating factor under 2017 Supp. K.S.A. 21-6624(f).

Over Lloyd's objection, Loudermilk's testimony from the first trial was read to the remand trial jury. The trial court allowed the prior testimony under two theories: Loudermilk was unavailable and her testimony was a prior sworn statement or testimony of a witness; and K.S.A. 2017 Supp. 21-6620(e)(3), relating to evidence concerning aggravating circumstances, provides a separate statutory basis for the admission of the

7

testimony. The court saw no due process violation in admitting the testimony because any putative coercion exercised by the State in threatening a parental rights proceeding was attenuated by the fact that the proceeding was completed before Loudermilk testified in the first trial.

Lloyd urges this court to find error in the admission of Loudermilk's testimony. While the United States Supreme Court has held that a *defendant's* coerced confession cannot be used at trial, see *Jackson v. Denno*, 378 U.S. 368, 385-86, 84 S. Ct. 1774, 12 L. Ed. 2d 908 (1964), no Supreme Court case has addressed the issue of whether coerced witness testimony may be used against a defendant at trial. This court has held that basing a conviction in whole or in part on the coerced statement of a witness may deprive a criminal defendant of due process. *State v. Daniels*, 278 Kan. 53, 65-66, 91 P.3d 1147 (2004).

We will assume without deciding that the admission of Loudermilk's transcribed testimony was erroneous. Because such error would constitute denial of due process, this court will apply the constitutional harmless error standard. Under this standard, we determine whether the State has proved that there is "no reasonable possibility that the error affected the verdict." *State v. Ward*, 292 Kan. 541, 569-70, 256 P.3d 801 (2011); see also *State v. Robinson*, 308 Kan. 402, 421 P.3d 713 (2018).

In his argument to this court, Lloyd contends that both Loudermilk's statements to police immediately after Chavira's death and Loudermilk's sworn testimony in court were the product of unlawful coercion. We need not address the statements made to the police because Lloyd voiced no objection to the introduction of those statements through police witnesses. No continuing objection was raised with respect to Loudermilk's statements to investigators; consequently, we cannot find error in admitting them to the jury for consideration.

On the other hand, Lloyd stated on the record and made an ongoing objection to the admission of Loudermilk's transcribed testimony from the first trial. Her statements about Lloyd's activities and the location of the body had already come into evidence through the testimony of police investigators. Her trial testimony did not recant previous statements to the police and gave no reason to believe that her sworn testimony reaffirming the earlier statements was untruthful or inaccurate. We therefore conclude that any error in providing the jury with the transcription of her trial testimony was harmless and provides no grounds for reversal

Lloyd next argues that the State failed to present sufficient evidence to show beyond a reasonable doubt that Lloyd had a prior felony conviction for a crime in which he inflicted great bodily harm, disfigurement, dismemberment, or death.

At the remand trial, the State argued, and the jury was instructed on, two bases for imposing a hard 50 sentence: a previous conviction of a felony that resulted in great bodily harm and commission of the instant crime in an especially heinous, atrocious, or cruel manner. The jury specifically found that the State established both grounds beyond a reasonable doubt and that they outweighed any mitigating factors. Lloyd now argues that the evidence was insufficient to prove that his previous felony inflicted great bodily harm. He does not contest the sufficiency of the evidence showing that the crime was heinous, atrocious, or cruel.

"When the sufficiency of the evidence is challenged in a criminal case, this court reviews the evidence in a light most favorable to the State to determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt." *State v. McBroom*, 299 Kan. 731, 754, 325 P.3d 1174 (2014). "Appellate courts do not reweigh

evidence, resolve evidentiary conflicts, or make witness credibility determinations." *State v. Daws*, 303 Kan. 785, 789, 368 P.3d 1074 (2016).

K.S.A. 2017 Supp. 21-6624(a) includes among aggravating circumstances that a jury may consider that "[t]he defendant was previously convicted of a felony in which the defendant inflicted great bodily harm, disfigurement, dismemberment, or death on another."

In support of this statutory factor, the State relied on Lloyd's 2007 guilty plea to aggravated assault based on an incident in which he shot Loudermilk in the foot. Lloyd argues on appeal that aggravated assault contains no essential legal element of inflicting bodily harm and, therefore, it cannot fit the statutory designation of a previous felony inflicting great bodily harm, disfigurement, or dismemberment.

This court exercises unlimited review when interpreting criminal statutes. Legislative intent governs that review, and the court has determined that reliance on the plain and unambiguous statutory language is the best and only safe rule for determining the intent of the legislature. We therefore read statutory language as it appears, without adding or deleting words. We move to statutory construction only if the language is unclear or ambiguous. *State v. Gray*, 306 Kan. 1287, 1294, 403 P.3d 1220 (2017).

Nothing in the plain language of K.S.A. 2017 Supp. 21-6624(a) requires that bodily harm be an element of the felony serving as an aggravating factor. The statute requires only that the previous offense is a felony and that, during the course of committing that felony, the defendant inflicted significant harm. A defendant may enter a plea to a nonperson felony, but a jury may still consider that felony as an aggravating factor if the facts underlying the conviction show that the defendant inflicted great bodily harm on another person.

In the previous appeal, we held that the evidence sufficed to show beyond a reasonable doubt that Lloyd "was previously convicted of a felony in which Lloyd inflicted great bodily harm or disfigurement." 299 Kan. at 645. The evidence was essentially the same in the second trial. Sergeant Lenny Rose of the Wichita Police Department testified that he had interviewed Loudermilk at the hospital, where she had been admitted and spent the night after Lloyd shot her in the foot. Viewing the evidence in a light most favorable to the State, we conclude that the jury had sufficient evidence to enable it to reach the reasonable conclusion that Lloyd committed a felony that inflicted great bodily harm or disfigurement on Loudermilk.

Finally, Lloyd asks this court to reconsider its decisions in *State v. Bernhardt*, 304 Kan. 460, 480-81, 372 P.3d 1161 (2016), and *State v. Robinson*, 306 Kan. 431, 444, 394 P.3d 868 (2017), holding that the retroactivity provision of K.S.A. 2017 Supp. 21-6620(e) does not violate ex post facto prohibitions. Lloyd offers no new analysis that would lead us to revisit those decisions, and we decline to do so.

CONCLUSION

Finding no error below, we affirm the sentence imposed following the remand.