NOT DESIGNATED FOR PUBLICATION

No. 118,039

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

ERICK SHAKEEL SMITH,
*Appellant*.


MEMORANDUM OPINION

Appeal from Shawnee District Court; MARK S. BRAUN, judge. Opinion filed October 19, 2018. Affirmed.

*Michelle A. Davis*, of Kansas Appellate Defender Office, for appellant.

*Steven J. Obermeier*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.


Before LEBEN, P.J., GREEN and MALONE, JJ.


PER CURIAM: Erick Smith appeals his convictions for aggravated robbery, aggravated assault, and criminal possession of a firearm. He first claims the district court denied him of his right to present a full defense by excluding testimony that contradicted the State's witnesses. This claim is not persuasive. Although the excluded testimony may have been relevant to Smith's defense, any error in excluding it was harmless because the testimony was based on a video that itself was admitted as evidence for the jury to see.

1

Smith next claims the district court erred by not including a limiting instruction telling the jury to consider evidence of Smith's prior conviction only in the context of his firearm charge. This claim has no merit because the court omitted the instruction at Smith's request.

Smith's third claim is that the prosecutor erred by characterizing some defense arguments as "rabbit holes." Like Smith's first two claims, this argument is also unpersuasive because the statements weren't improper comments on the evidence or attempts to divert the jury's role as fact-finder. Nor could they reasonably be perceived as something that could inflame the passions of the jury. We therefore affirm the district court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

Erick Smith appeals his convictions for aggravated robbery, aggravated assault, and criminal possession of a firearm, all of which stem from events that took place on the evening of St. Patrick's Day 2016.

That evening, DeSean Johnson and his wife, Crystal, went to celebrate at Los Charros restaurant in Topeka. At some point during the evening, Crystal decided to step outside to the parking lot for a smoke break. Shortly thereafter, DeSean was robbed in the parking lot. While the parties generally agree about this much, they disagree about the several events between Crystal stepping outside to smoke and DeSean being robbed.

At Smith's jury trial, DeSean told the jury that he went to the restaurant with Crystal and two of her female friends—one named Kelsey and one he didn't know. A couple of hours after arriving at the restaurant, Crystal decided to go out to their car so she could smoke a cigarette. DeSean explained that "we just walked outside and I didn't want [Crystal] out there by herself and so went out so she could have a smoke

2

break . . . ." DeSean said he, Crystal, and Crystal's friends walked to the car, where Crystal sat inside to smoke and DeSean was "leaning on [Crystal's] car."

While Crystal was still inside the car, DeSean said a man whom he had never met approached DeSean and asked if he could "holler at [DeSean] real quick." According to DeSean's testimony, the man was accompanied by three other men. DeSean, who described himself as a "people person," said he walked about "a car length" away from where his car was parked and "talked to [the man]," who was standing two to three feet away from DeSean. After DeSean walked over to the man, the man told DeSean, "I'm going to need that." When DeSean asked the man what he was talking about, the man "pulled his shirt up [and] flashed [DeSean] a weapon," which DeSean said was a black gun. DeSean said he then realized the man was asking for the chain and watch DeSean was wearing. Since DeSean "didn't want anything to escalate," he gave the man what he had asked for. DeSean also gave the man his wallet, which contained "pictures of [his] children, bank cards, Social Security cards, and about 218 bucks in cash."

DeSean explained that his wife was still sitting in their car when all of this took place, but he said she approached the men after DeSean had removed his chain and watch, but before DeSean had surrendered his wallet. He said Crystal "ran over . . . when she looked out the window and realized what was happening." She told the man, "[Y]ou don't do this to hardworking people." Then, according to DeSean, the man took out the gun and pointed it at Crystal. After the man told Crystal "to shut up, a few obscenities and . . . [to] get back in the car," DeSean said the man then told Crystal and DeSean they "could roll out." DeSean told the jury that he was afraid and didn't want anyone to get hurt.

At that point, DeSean said he and Crystal walked back to their car and drove to the other side of the parking lot, where they called the police. Crystal's two friends left before the officers arrived. DeSean said he described the man to the police as "a tall fellow [with]

3

glasses, [a] hat, an orange hoodie zip-up, and brown khakis." He also said the man had a mustache and "[b]raids to his shoulders."

After the robbery, DeSean said the police approached him with still images from the restaurant's surveillance video. He recognized the man who robbed him in one of the photos, noting that the man in the photo was wearing the same outfit DeSean had described when he provided the police with a description. Shortly thereafter, the police went to DeSean's house and asked him to look at a photo array of possible suspects. DeSean described how he recognized the person in one of the photos, based on the suspect's "general look, features, [and] braids." Then, before DeSean identified the man for the police, he looked at the photo from the surveillance video on DeSean's phone to compare the man in the photo array with the man in the photo from the video. After comparing the photos, DeSean tentatively identified the man in the fifth photo of the array as the man who robbed him but told the detective that he couldn't make a positive identification.

Crystal Johnson's trial testimony describing the robbery and the events leading up generally tracked DeSean's testimony. She described going to Los Charros to celebrate St. Patrick's Day and said that at some point during the night she stepped outside to go smoke in her car. She explained that DeSean went outside with her and her friends so they wouldn't be alone in the parking lot.

Like DeSean, Crystal told the jury that a man approached her husband and "asked [DeSean] if he could holler at him." She described how she hadn't known what was going on "until [she] noticed [DeSean] start taking off his jewelry." Crystal specifically noted that she had seen DeSean give the man his chain, watch, and everything in his wallet.

At that point, Crystal said she "jumped out of the car and started yelling [that they] are hardworking people." Then she "saw the gun as he pulled it out of his pants." During cross-

4

examination, Crystal testified that the man's gun "was pointed towards [her] face." Although Crystal got out of the car, she said she never approached where the man and DeSean were standing. She told the jury that she had been terrified that the man was going to shoot her and DeSean.

After the robbery, Crystal said that she and DeSean drove to another part of the parking lot and called the police.

The day after the robbery, the owner of Los Charros called Crystal and asked if she wanted to watch the surveillance video. Crystal said she went to Los Charros and watched the video. While she was watching the video, she recognized the man that robbed DeSean. She took pictures "of a couple of [the] stills of the video of the guy that robbed [them,]" which she later shared with DeSean.

Crystal then explained how the police prepared a document with stills from the surveillance video, which they received from Los Charros. After the police created the document with photos from the video, Crystal said officers showed her the document to see if she could recognize the robber from the photos. Crystal said she had recognized the man who robbed them in one of the photos in the document, so she signed her name next to that picture. After Crystal identified the suspect in the document with photos from the video, officers showed her a photo array. She said she didn't consult with DeSean before she looked at the photo array. Crystal said when she looked at the photos she had identified the subject in the fifth photo as the one who had robbed DeSean with about 90% certainty.

After several other officers involved in the investigation testified, the State called Detective Lance Green—the lead detective in the case—to the stand. He explained how responding officers who spoke with the Johnsons had received a "general suspect description" of a "black male, tall, thin, braids, a goatee, an orange zip-up hoodie, and tan khaki pants." Green said he had then watched the surveillance video and met with the

5

Johnsons about the video. When asked to discuss what happened during the meeting, Green said:

> "I informed [the Johnsons] that I had reviewed the video, that I had seen the suspect in the orange zip-up hoodie that I believed they were referring to but that there were also other people with that suspect. I then asked them to identify and confirm that the person in the video wearing the orange zip-up hoodie is the person that they recognized as the suspect."

Green also confirmed that the Johnsons "had seen the video at some point later in the evening after officers had spoken to them and conducted their investigation."

After discussing the meeting, Green told the jury about the document that he created with the images from the surveillance video. He explained that next to each of the photos there were some typed words "prepared by members of the organized crime and gang unit who assisted [Green] with this document." Green also said that he had ideas about who some individuals in the document were—one of whom Green had already identified as Ryland Patton.

Green told the jury that after the Johnsons confirmed which individual in the photos was the person who robbed them, "[he and his team] took still photos from that same surveillance video and a document was prepared which was then supplied to various media outlets and social networking sites." Green then explained how he had used documents from the social media campaign to identify the suspect as Smith. After Green had identified Smith as the suspect, he prepared the photo lineup for the Johnsons. Smith's photo was fifth in the lineup Green created for the Johnsons. That was the person whom Crystal positively identified as the suspect; DeSean had tentatively identified the same person.

6

About a month into the investigation, Green interviewed Smith. An edited version of the video of the interview was admitted into evidence. During it, Smith admitted that he was at the restaurant on the night of the robbery but denied any involvement with the robbery.

Smith told Green that he had been at Los Charros with Ryland Patton, Terrance Dean, and Shawntae Rogers. Smith said that he had come to the restaurant with a woman named Briana Davis, who was standing outside the restaurant but left, according to Smith, after Terrance Dean committed the robbery. Smith said that he and Dean had left the bar and smoked a cigarette together outside. Smith said that while he and Dean were outside, Dean had told Smith that he wanted a chain or necklace, and Smith told Dean that he didn't want anything to do with that "situation." Smith then told Green that he left and didn't know what took place after that; but he said that Dean had later called Smith to tell him that "he got the necklace." Smith denied knowing what Dean had done with the necklace and said there wasn't any information about that on his phone.

Smith also told Green that he was sure that Dean had the gun, which Smith said was a black semi-automatic that Dean pulled from his pocket. Smith said Dean told the victim to "come here," but said that at that time he was already walking toward Davis' car to get into the car with her to leave with her. When Green asked Smith who all had been outside with him, Smith said it was "Ryland, Shawntae, Terrance, Chantel, Santana, and Briana." Smith told Green that when he was in Davis' car, he had told her that "Terrance [Dean] was up [on] some bullshit and that [he] needed to go home."

Later in the investigation, Green interviewed Briana Davis, who denied that Smith had said those things. Green also said that Davis had denied giving Smith a ride or even knowing that a robbery had taken place that night. Davis testified at trial, where she said she had been at the restaurant with her brother, Ryland Patton, and Terrance Dean. Davis told the jury that she had driven to and from the restaurant with her brother.

The State charged Smith with one count of aggravated robbery, one count of aggravated assault with a deadly weapon, and one count of criminal possession of a firearm. Smith pleaded not guilty to each charge. The jury convicted Smith on all three counts, and the court sentenced Smith to 245 months in prison.

Smith then appealed to our court.

ANALYSIS

I. *The District Court Didn't Deny Smith of His Right to Present a Full Defense.*

Smith first claims the district court erred by not letting him present evidence that supported his theories of defense that (1) the Johnsons' testimony was unreliable and their identification of Smith as the robber was incorrect; (2) the detective didn't adequately investigate the case and didn't find any corroborating evidence; and (3) another man at the restaurant was responsible for the robbery. Smith says the district court's error deprived him of his right to a fair trial.

The defendant has a constitutional right to present his or her theory of defense at trial, so the exclusion of evidence that's significant to that theory may violate a defendant's fundamental right to a fair trial. But the right is usually subject to statutory rules and caselaw about matters of evidence and procedure. We review a claim that the defendant wasn't allowed to present his or her chosen defense as a question of law subject to independent review on appeal. *State v. Maestas*, 298 Kan. 765, 780-81, 316 P.3d 724 (2014).

When we consider the admissibility of evidence, we first look to see whether the evidence is relevant; all relevant evidence is admissible unless otherwise prohibited. See K.S.A. 60-407(f); *State v. Burnett*, 300 Kan. 419, 427, 329 P.3d 1169 (2014). Relevant

8

evidence "ha[s] any tendency in reason to prove any material fact." *State v. Bowen*, 299 Kan. 339, Syl. ¶ 5, 323 P.3d 853 (2014). The determination of whether evidence is relevant depends on whether the evidence is both material and probative. Evidence is material when the fact it supports is in dispute in the case; review for materiality is de novo. 299 Kan. at 348. Evidence is probative if it has any tendency to prove any material fact. *State v. Lowrance*, 298 Kan. 274, 288-89, 312 P.3d 328 (2013). We review a district court's assessment of the probative value of evidence under an abuse of discretion standard. *State v. Huddleston*, 298 Kan. 941, 959-60, 318 P.3d 140 (2014).

The bulk of Smith's claim stems from the district court's decision to exclude testimony from Ed Brundt—a private investigator and former police officer—based on a timeline he created using the restaurant's surveillance video, showing when people entered and left the restaurant. The State objected, arguing that creating the timeline was "something . . . the jury can do itself. . . . [and] something that the attorneys can do themselves in argument."

After hearing both sides, the district court excluded the timeline, explaining that because the activity on the video was a question of fact for the jury to determine, and counsel could highlight portions of the video during the closing argument. The court didn't explicitly make findings on whether Brundt's testimony, based on the timeline he created, was relevant. Still, the evidence was relevant because it challenged the credibility of three of the State's main witnesses: DeSean, Crystal Johnson, and Detective Green. As Smith argued to the court,

> "[Brundt] is a person who has gone and reviewed the videotape and is giving information and is part of the defense. And part of the defense is that they weren't there. Part of the defense is that Mr. and Mrs. Johnson didn't leave together. . . . And that's clearly showing part of the defense is that the people that they said were outside weren't outside. And the part that Mr. Brundt is reviewing the video to say that during this period of time and

9

that's all that's been presented as to where these people were at at Los Charros. This is what was happening."

Smith argues that this testimony would have contradicted the Johnsons' narratives that they left the restaurant together. It would have also contradicted Detective Green's testimony that all four male subjects were outside at the same time. In other words, Brundt's testimony could have challenged the credibility of three of the State's main witnesses. "Credibility of witnesses may be a material fact in dispute in a case," and here, the credibility of the Johnsons and Detective Green was material since it went to whether their narratives placing Smith outside at the time of the robbery were accurate. See *State v. Hopkins*, No. 110,581, 2015 WL 1310081, at *6 (Kan. App. 2015) (unpublished opinion) (citing *State v. Lloyd*, 299 Kan. 620, 639, 325 P.3d 1122 [2014]).

On the other hand, Brundt wasn't a fact witness—he didn't personally see any of the events that night at Los Charros. Rather, his testimony was based on his having looked at the videotape and determined who was where and at what times. To do that, of course, he first had to identify the individuals on the videotape and match them to the various parties who were there that night. He did that based on having seen some of them in person and others in photographs—something the jury could do in the same manner. As the State notes, in a similar case, our court held that it was error even to allow a witness (there, a police detective) to do the jury's task of matching those seen in a video with specific individuals. See *State v. Hampton*, No. 91,848, 2005 WL 697446, at *3 (Kan. App. 2005) (unpublished opinion). The trial judge here seemed to rely on a similar rationale for excluding the testimony, saying that it would be Brundt "doing the jury's job . . . and that's part of the difficulty . . . in having somebody watch the video and then report about the video. That's like saying I read a police officer's report and here's what I think it says."

10

So the timeline of who was where and when that night—which is partially shown in the video—was certainly relevant. What's less clear is whether it was admissible opinion testimony. After all, Brundt didn't see the events firsthand and the jury could also review the videotape. See K.S.A. 2017 Supp. 60-456(a) (a witness' nonexpert opinion testimony must be "rationally based on the perception of the witness" and "helpful to a clearer understanding of the testimony"). Even if we assume that the district court erred when it excluded Brundt's testimony about the videotape and the timeline of who was where and at what time, we have concluded that the error did not affect the trial's outcome and thus was harmless.

Since the defendant is objecting that the exclusion of this evidence violated his constitutional right to fully present his theory of defense, we will assume that the more rigorous constitutional-harmless-error standard applies. See *State v. Lloyd*, 308 Kan. 735, 423 P.3d 517 (2018). Under this standard, the question is whether the State has proved that there is "no reasonable possibility that the error affected the verdict." *State v. Ward*, 292 Kan. 541, 569-70, 256 P.3d 801 (2011); *Lloyd*, 423 P.3d at 522 (citing *Ward*).

Smith argues that the district court's error is reversible because "[i]f Green's credibility or reliability as a witness is undermined through Investigator Brundt's testimony, then the defense has damaged the State's case." We do not find this persuasive.

As we've already noted, Brundt's excluded testimony was based only on his observations of the surveillance video; he had no first-hand basis for the timeline he created of the events on the night of the robbery. But the jury had access to the same video during its deliberations and, as the court noted during trial, could also look at the video and decide who was where at any given time during the night.

In addition, as the State points out, the court gave Smith the opportunity to discuss the contents of Brundt's timeline during his closing argument, and Smith doesn't

argue that his attorney was in any way prevented in closing argument from explaining what was shown on the video. For example, Brundt's timeline included his observation that Crystal and DeSean Johnson left the restaurant separately. During his closing argument, Smith's attorney argued that the video contradicted the Johnsons' statements that they left the restaurant together. Smith's attorney also discussed in closing argument how the video contradicted the Johnsons' claim that Smith and his four friends had all been outside during the robbery by showing that Ryland Patton "and the other gentleman in the group" had previously entered Los Charros and didn't leave before the video ended.

Likewise, Smith's attorney argued that the video supported his claim that Detective Green hadn't adequately investigated the robbery. The attorney argued that the two friends with whom Crystal Johnson left the restaurant didn't return before the video ended, which Smith suggested was proof that those women were "[w]itnesses to what took place [and] weren't contacted."

In sum, although the court excluded Brundt's timeline, Smith still had ample opportunities to point out the contradictions between the surveillance video and both Detective Green's testimony and that of the Johnsons. Although Brundt's timeline testimony was relevant and arguably admissible in Smith's defense, excluding it didn't prevent Smith from fully presenting his defense to the jury.

Smith also complains about the exclusion of evidence on two other topics: (1) that "law enforcement had searched Dean's house five weeks after the robbery and had found a black gun" there; and (2) Dean's record of past criminal offenses. We find no error in the exclusion of this evidence.

Smith sought to admit evidence showing that officers found a black gun in Dean's house during a search for an unrelated federal case. Smith also tried to admit evidence showing Dean's past criminal offenses. The State filed a pretrial motion to exclude this

12

evidence, arguing that the evidence was "solely for the purpose of inviting the jury to infer that Dean was the robber because of his propensity to commit criminal acts [and] the risk of undue prejudice is . . . high."

The court granted the State's motion, explaining that

"there is no evidence that that gun [found in Dean's residence] is the same gun that was used in the robbery. It's purely speculative. . . . I think it gives the jury a false impression and an unfair impression to say that because [Dean] may have possessed a weapon . . . that it was the gun that he possessed or may have possessed [at the time of the robbery] in March."

As for Dean's criminal history, the court explained that it was inadmissible propensity evidence used to show that because Dean had committed past crimes it was likely that he committed this robbery.

The court's ruling on these points was correct. With no evidence linking the gun in Dean's home to the one used in the robbery, the fact that Dean possessed a gun after the robbery is neither material nor probative of whether Smith or Dean committed the robbery. The court also correctly excluded evidence of Dean's criminal history. Admitting the evidence would have served no purpose other than to try to convince the jury that Dean's criminal history showed that he was predisposed to committing crimes generally. See K.S.A. 2017 Supp. 60-455(a) ("[E]vidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove such person's disposition to commit crime or civil wrong as the basis for an inference that the person committed another crime or civil wrong on another specified occasion.").

Still, Smith argues that it's unfair that the court admitted evidence of his criminal history without a limiting instruction while refusing to admit evidence of Dean's criminal history. But Dean wasn't on trial—Smith was. Smith's prior conviction was admitted only because it related to the charge that he illegally possessed a firearm.

13

With no evidence linking the gun in Dean's possession to the robbery, the fact that Dean had the gun was simply irrelevant. And evidence of Dean's criminal history was properly excluded because it was propensity evidence under K.S.A. 2017 Supp. 60-455.

II. *The District Court Didn't Err by Not Including a Limiting Instruction.*

Smith's next claim is that the district court committed reversible error by failing to provide an instruction limiting the jury's consideration of Smith's stipulation of his prior felony conviction. Since Smith didn't request a limiting instruction at trial, we review his claim only for clear error, meaning that reversal is required if "[this court] is firmly convinced that the jury would have reached a different verdict without the error." *State v. Betancourt*, 299 Kan. 131, 141, 322 P.3d 535 (2014).

In cases like this one, when the defendant's status is an element of a charged offense—here, Smith's status as a felon prevented his possession of a firearm—"a defendant may stipulate that he has the necessary predicate conviction and the court is required to accept the stipulation." *State v. Mburu*, 51 Kan. App. 2d 266, 346 P.3d 1086 (2015). When a district court admits a stipulation of a prior crime, it is also required "to give a limiting instruction informing the jury of the specific purpose for admission . . . ." *State v. Gunby*, 282 Kan. 39, 48, 144 P.3d 647 (2006); see *State v. Campbell*, 308 Kan. 763, 423 P.3d 539, 545-46 (2018).

In Kansas, Pattern Instruction 51.030 is the recommended instruction for limiting a jury's consideration of stipulations of a prior crime. PIK Crim. 4th 51.030. Here, however, Smith explicitly objected to including PIK Crim. 4th 51.030 at the final jury-instruction conference. His attorney argued that the key language had already been included in a separate instruction. That instruction, based on PIK Crim. 4th 51.020, told the jury:

14

> "In consideration of count three only, the following facts have been agreed to by the parties and are to be considered by you as true,
>
> 1. Within five years preceding [March 17, 2016], the defendant was convicted of a felony, and was not found to be in possession of a firearm at the time of that crime."

Although the district court offered to include a limiting instruction, Smith's attorney reasoned that "[PIK] 51.02[0] contains . . . similar language that's in 51.030. So I would object to . . . 51.030 being included. . . . I think [PIK] 51.020 [is] sufficient." The State responded that it was "assuming that [Smith's attorney] is an able attorney and has made a strategic decision to not include that additional instruction." Smith's attorney agreed with the State's assessment.

Our Supreme Court has held that when "the record clearly shows that the trial court offered to give a limiting instruction and was willing to do so but did not give such an instruction because defense counsel on the record objected to the limiting instruction," then "the defendant has no right to complain." *State v. Gray*, 235 Kan. 632, 635-36, 681 P.2d 669 (1984). This is exactly what happened here. The court offered to include a limiting instruction, and Smith objected. So Smith, like the defendant in *Gray*, "has no right to complain." 235 Kan. at 636; see *State v. Fleming*, 308 Kan. 689, 701, 423 P.3d 506 (2018) (concluding that invited error precludes the review of appellant's asserted jury-instruction error); *State v. McCammon*, 45 Kan. App. 2d 482, 488, 250 P.3d 838 (2011) ("Where a party's strategic choices at trial have adverse consequences, we have refused to grant relief on appeal from those same choices."). We therefore find no error in the district court's failure to include a limiting instruction.

15

III. *The Prosecutor Didn't Commit Reversible Error When It Referred to Some Defense Arguments as "Rabbit Holes."*

Smith next argues that the prosecutor erred when it characterized some defense arguments as "rabbit holes" and said some facts presented to the jury were "meaningless." Smith says the prosecutor's statements amount to reversible error because they violated his right to a fair trial.

Although Smith didn't object to the State's comments, we review claims of prosecutorial error in closing argument even without an objection. In doing so, though, the presence or absence of an objection may figure into the analysis of the alleged misconduct. *State v. Sean*, 306 Kan. 963, 974, 399 P.3d 168 (2017).

We apply a two-step process to evaluate claims of prosecutorial error. First, we must decide whether the prosecutor's statements fall outside the wide latitude given to present the case as long as the prosecutor's actions do not offend the defendant's constitutional right to a fair trial. *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016). If we find error at that stage, then the State must show "beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict." 305 Kan. 88, Syl. ¶ 8.

With those rules in mind, let's turn to the comments at issue. During its closing argument, the prosecutor said:

> "One of the things that I'm going to talk to you about today is that there are some facts that you have been presented with in the trial which are essentially meaningless. There are a lot of rabbit holes that we jump down that don't really go anywhere. There are other facts that are . . . not very meaningful . . . . But the things that the State is required to prove are in the jury instructions. . . ."

16

Then the prosecutor went on to describe some of the "rabbit holes" Smith had allegedly gone down at trial, including whether Crystal Johnson had initially reported that Smith pointed a gun at her and "what Mr. and Mrs. Johnson said or didn't say to certain people at certain times." The prosecutor told the jury that the "rabbit holes . . . do not contribute or . . . take away from the big question of who was the person that robbed [the Johnsons]." Smith countered that the discussion about the discrepancies in the Johnsons' testimony weren't "rabbit holes" because it was "information that [the jury had] to look at to determine [the Johnsons'] reliability and trustworthiness."

Prosecutors have wide latitude in language and manner or presentation of closing arguments, so long as the argument is consistent with the evidence. This wide latitude includes "the freedom to craft an argument that includes reasonable inferences based on the evidence." *State v. Pabst*, 268 Kan. 501, 507, 996 P.2d 321 (2000). A prosecutor's closing remarks fall outside the wide latitude given when (1) the prosecutor comments on facts not in evidence, (2) makes comments to divert the jury's attention from its role as a fact-finder, or (3) makes comments that serve no purpose other than to inflame the passions of the jury. *State v. Stimec*, 297 Kan. 126, 128-29, 298 P.3d 354 (2013). Smith says the prosecutor's statements were improper for all three of those reasons. We disagree.

First, Smith argues that the prosecutor improperly commented on the evidence by referring to parts of Smith's case as "rabbit holes." He suggests that the prosecutor comments were "opinion[s] on the credibility of the defense" and an "improper characterization of a defense." It's true that a prosecutor "may not state his or her personal belief as to the reliability or credibility of testimony given at a criminal trial." *State v. Brinklow*, 288 Kan. 39, Syl. ¶ 6, 200 P.3d 1225 (2009); *State v. Johnson*, No. 117,510, 2018 WL 3405490, at *5 (Kan. App. 2018) (unpublished opinion), *petition for rev. filed* August 10, 2018. But that's not what the prosecutor did here. To the contrary, the prosecutor just told the jury what evidence was important. And that's what the prosecutor

17

said he was going to do in the first place: "I'm not going to tell you what the evidence says in the sense that I'm giving you my opinion . . . . But I am . . . going to tell you what evidence you should look at." In none of the statements Smith has challenged did the prosecutor ever imply that specific defense evidence lacked credibility.

Smith also contends the prosecutor's statements improperly "distracted the jury from its role as fact-finder" and "implied that the defense was trying to fool the jury," thus "appeal[ing] to jurors' passions and sympathies." But during closing argument, the prosecutor reminded the jury it was the fact-finder. The prosecutor never diverted the jury from its duty to decide the case based on the evidence. Nor did the prosecutor say anything that could be construed as an attempt to appeal to the jury's passions and sympathies. Instead, the prosecutor simply encouraged the jury to avoid getting lost in the weeds and focus on some evidence the State argued was more important over other evidence less central to the case. We find no prosecutorial misconduct here.

IV. *There Was No Reversible Cumulative Error.*

Smith also contends that even if the issues he has raised thus far aren't individually reversible, the cumulative effect of these claimed errors effectively denied him a fair trial. He's right that there can be cases in which the cumulative effect of several errors may require reversal even though no single error rose to that level. See *State v. Killings*, 301 Kan. 214, 242, 340 P.3d 1186 (2015). Here, though, the only potential error we've identified was the district court's decision to exclude evidence of Brundt's timeline. But we also concluded that even if that was an error, it was harmless. Since the district court committed only one potential error—one we've found harmless—there can be no cumulative error here.

18

V. *The District Court Didn't Violate Smith's Right to Due Process When It Considered Smith's Criminal-History Score in Calculating Smith's Sentence.*

For his final claim, Smith argues that the district court violated his due-process rights when it imposed a sentence based on his criminal-history score of "A." He says that by using his prior convictions to increase his sentence, the court violated *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), which held that the Sixth Amendment to the United States Constitution requires that any fact that increases the penalty for a crime beyond the prescribed statutory maximum—"[o]ther than the fact of a prior conviction"—must be submitted to a jury and proved beyond a reasonable doubt.

But Smith concedes that the Kansas Supreme Court has already considered this issue and confirmed that *Apprendi* does not keep the court from considering the mere fact of a prior conviction when applying the Kansas sentencing guidelines. Thus, a defendant's criminal-history score doesn't have to be proved to a jury beyond a reasonable doubt before it can be used to determine a defendant's sentence. See *State v. Overman*, 301 Kan. 704, 716, 348 P.3d 516 (2015); *State v. Ivory*, 273 Kan. 44, 47-48, 41 P.3d 781 (2002).

We affirm the district court's judgment.